

**FILED**

APR 2 6 2017

CLERK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CIVIL ACTION NO.** 17-5032 |
| *ex rel.* **Brian Gravely,** | |
| **Relator,** | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| **National American University, National American University Holdings, Inc., and Dlorah, Inc.** | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **Defendants.** | |

Relator Brian Gravely, by and through his attorneys, brings this Complaint on behalf of the United States under 31 U.S.C. § 3730 *et seq.* Based on personal knowledge, unless otherwise indicated, and relevant documents, Relator alleges the following:

## INTRODUCTION

1.     This is a qui tam action brought by relator, Brian Gravely, on behalf of the United States of America, pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended. This action claims that National American University (NAU) has fraudulently received funds through Title IV of the Higher Education Act of 1965 by making false statements asserting its compliance with accreditation requirements for its Medical Assisting program and with Title IV's Incentive Compensation Ban and 90/10 Rule.

2.     NAU's eligibility to receive student financial aid from the federal government is dependent, among other things, on its agreement to a Program Participation Agreement (PPA) required by the Department of Education (DOE). 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14(a). By entering into a PPA, NAU agrees that it will comply with all applicable program statutes and implementing regulations, including those provided in Title IV of the Higher Education Act of 1965 (20 U.S.C. §§ 1070-1099(d), as well as 34 C.F.R. Parts 600 and 668.[1] *Ongoing* compliance with the terms of the PPA is mandated by statute. 20 U.S.C. 1094(a) (stating that compliance with PPA conditions "the initial and continuing eligibility of an institution" to participate in Title IV programs).

3.     Under its PPA, NAU must "meet the requirements established by the Secretary and accrediting agencies or associations." 20 U.S.C. § 1094(a)(21); *see also* 34

---

[1] Relator does not have a PPA for NAU, but the "General Terms and Conditions" spelled out in publicly available PPAs, contain this provision. *See e.g.*
http://www.unc.edu/sacs/March2016/Web_Public/Docs/4.7/program-participation-agreement.pdf;
https://web.saumag.edu/finaid/files/2013/08/SAU-Program-Participation-Agreement.pdf.

C.F.R. 668.14(23). NAU is further prohibited from making substantial misrepresentations to accrediting agencies. 34 C.F.R. § 668.71(c). With respect to its Medical Assisting program, NAU attested in its accreditation site visit in February 2013 that its Roseville, Minnesota program was, and would continue to be, in compliance with Medical Assisting program accreditation requirements. However, it was not in compliance in at least two ways: it failed to provide timely and appropriate externships for its students as required by CAAHEP; and it failed to keep appropriate documentation related to students and their performance in the program. Not only does failure to keep adequate documentation violate CAAHEP requirements, but it also violates a more general PPA requirement that an institution must "establish and maintain administrative procedures and records to ensure proper and efficient administration of funds." 20 U.S.C. § 1094(a)(3); 34 C.F.R. § 668.14(b)(4).

4.      Under its PPA, institutions are also restricted from requiring students to borrow additional federal funds because of delays attributable to the institution. 20 U.S.C. § 1094(a)(19); 34 C.F.R. § 668.14(b)(21). Relator alleges that NAU's delay in providing timely and appropriate externships to Medical Assisting students caused them to borrow additional federal funds.

5.      Under its PPA, NAU is required to derive no more than 90% of its revenue from federal student aid, which means at least 10% of its revenue must be from another source. 20 U.S.C. § 1094(a)(24); 34 C.F.R. § 668.14(b)(16). NAU must accurately report

these proportions of its revenue on an annual basis. 34 C.F.R. §§668.28(a). Relator alleges that NAU falsely reported its revenue under the 90/10 Rule.

6.     Under its PPA, NAU is further prohibited from paying a commission, bonus, or other incentive payment to an employee involved in recruiting based on success in securing student enrollments (Incentive Compensation Ban). 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(i). Relator alleges that NAU offered him financial incentives based on success in securing student enrollments and paid employees involved in recruiting students for continuing education courses on the basis of such success.

7.     Accordingly, NAU was not in compliance with its statutory and regulatory obligations under its PPA when it renewed its PPA with the Department of Education in June 2013, thereby stating that it had met and would continue to meet material requirements of the PPA. Its conduct then and subsequently, indicated that NAU knew that it had not complied and did not intend to comply with its PPA requirements. It therefore fraudulently induced the Government to find it eligible for receipt of Title IV funds. That fraud continued with NAU's assertion of its compliance with its PPA in its required annual compliance audit of its administration of its Title IV programs and audit of its general purpose financial statements. 34 C.F.R. § 668.23. Moreover, each request for Title IV funds on behalf of individual students constitutes at least an implied certification that NAU is in compliance with its PPA, which it is not. NAU has therefore submitted and caused to be submitted to the Government false claims for payment in violation of 31 U.S.C. § 3729, *et seq.*

4

8.     NAU knowingly and intentionally made these fraudulent misrepresentations to the federal government to receive millions of dollars in federal money through student loans. Pursuant to the False Claims Act, Relator seeks to recover damages on behalf of the United States arising from NAU's knowingly false statements of compliance with its regulatory and contractual obligations to the Government that caused the distribution of these funds to NAU.

9.     Relator Brian Gravely also brings claims for retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h) and the Minnesota Whistleblower Act, Minn. Stat. § 181.931 *et seq.*

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a), because NAU can be found and does business in this District. In addition, NAU has committed acts proscribed by 31 U.S.C. § 3729 *et seq.* in this District. Furthermore, NAU operates four campuses in this District in addition to offering online classes to residents of this District.

12.     Relator is aware of no statutorily relevant public disclosure of the allegations or transactions in this Complaint. Even if such a disclosure had occurred, relator is an "original source" of the allegations in this Complaint and meets the requirements of 31 U.S.C. § 3730(e)(4)(B). During his time at NAU, Relator acquired

5

direct and independent knowledge of the information on which the allegations in this Complaint are based and he voluntarily and in good faith provided this information to the Government before filing this action.

## PARTIES

### A.    Plaintiff/Relator

13.    The United States of America is the plaintiff on whose behalf Relator brings this action under 31 U.S.C. § 3729 *et seq*. The United States acts through its various agencies and departments, including the Department of Education (DOE) and other relevant government payors.

14.    Relator is a citizen of the United States, and a resident of the state of Minnesota.

15.    Relator has worked at NAU in varying capacities since 2007. Prior to his retaliatory termination on May 24, 2016, Gravely worked as NAU's Continuing Legal Studies Director.

16.    Relator's employee paycheck indicates Dlorah, Inc. as the payor.

### B.    Defendants

17.    National American University Holdings, Inc. (NAUH) is a Delaware corporation with its principal offices at 5301 S. Hwy 16, Rapid City, South Dakota, Pennington County. NAUH is a publicly traded company (NASDAQ:NAUH).

18.    Dlorah, Inc. is a South Dakota corporation with its headquarters also at 5301 S. Hwy 16, Rapid City, South Dakota 55701, Pennington County.

6

19.    Dlorah is a wholly owned subsidiary of NAUH.[2]

20.    NAUH, through Dlorah, owns and operates National American University
(NAU).[3]

21.    NAU is a for-profit university with 35 campuses across the United States.[4]
Its enrollment by total headcount was 7,240 students as of November 30, 2016.[5] During
fiscal year 2016, NAU employed approximately 70 full-time and 800+ part-time faculty
members and more than 800 staff and administrative personnel.[6]

22.    NAU, like NAUH and Dlorah, has its principle offices at 5301 S. Hwy 16,
Rapid City, South Dakota 55701, Pennington County.

23.    NAUH, Dlorah, and NAU (together "NAU" or "Defendant") share
common ownership and management. For example, Ronald L. Shape is the President and
Chief Executive Officer of NAUH,[7] a principle officer or director of Dlorah,[8] and the
Chief Executive Officer and System Interim President of NAU.[9] The following are
members of the Board of Directors for both NAUH[10] and NAU[11]: Robert D.

[2] 2016 Annual Report at p. 93,
http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf
[3] 2016 Annual Report at p. 93,
http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf
[4] http://www.national.edu/about-nau/
[5] http://www.national.edu/wp-content/uploads/2015/02/NAUH-Q2-2017-FINAL.pdf
[6] 2016 Annual Report at p. 17,
http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf
[7] 2016 Annual Report at p. 119,
http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf
[8] 2017 Dlorah Annual Report,
https://sosenterprise.sd.gov/BusinessServices/Business/FilingDetail.aspx?CN=1890391730670281812152
0608500518012909511525232
[9] http://www.national.edu/about-nau/investor-relations/management/
[10] 2016 Annual Report at p. 119,
http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf

Buckingham, Jim Rowan, Jerry L. Gallentine, Jeffrey Berzina, Thomas D. Saban, Therese Crane and Richard Halbert. David Heflin is a principal officer or director of Dlorah,[12] and the Chief Financial Officer of NAUH.[13]

24.     NAUH conducts substantially all of its business and generates substantially all of its revenue from NAU through Dlorah.[14] NAUH's total revenue for the fiscal year ending May 31, 2016 was $96,113,000.00. NAU generated 98.88% of NAUH's revenue for the fiscal year ending May 31, 2016.[15]

## STATUTORY AND REGULATORY CONTEXT

### A.     The False Claims Act

25.     The False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, provides that:

(a)     (1) . . . any person who

    (A) knowingly presents, or causes to be presented, a false or
        fraudulent claim for payment or approval;

    (B) knowingly makes, uses, or causes to be made or used, a false
        record or statement material to a false or fraudulent claim; . . .

    is liable to the United States Government. . . .

(b)     For purposes of this section—(1) the terms "knowing" and
       "knowingly"—

---

[11] http://www.national.edu/about-nau/investor-relations/management/
[12] 2017 Dlorah Annual Report,
https://sosenterprise.sd.gov/BusinessServices/Business/FilingDetail.aspx?CN=18903917306702818121520608500518012909511525223 2
[13] 2016 Annual Report at p. 119,
http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf
[14] 2016 Annual Report at p. 5,
http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf
[15] 2016 Annual Report Amendment, dated March 6, 2017 at p. 97,
https://www.sec.gov/Archives/edgar/data/1399855/000165495417001714/nauh_10ka.htm

(A) mean that a person, with respect to information--

    (i)     has actual knowledge of the information;

    (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

    (iii)   acts in reckless disregard of the truth or falsity of the information, and

(B) require no proof of specific intent to defraud; . . .

(2) the term "claim" –

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that –

    (i)     is presented to an officer, employee, or agent of the United States; or

    (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest...

31 U.S.C. § 3729(a)(1)(A)(B) and (b) (FCA as amended by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21).

26.    The FCA also prohibits retaliation against an employee because of lawful acts done by the employee "in furtherance of an action under this section or other efforts to stop 1 or more violations" of the FCA. 31 U.S.C. § 3730(h).

**B.    Department of Education Regulations and Certifications to the Government through the Program Participation Agreement.**

27.    The DOE regulates higher education institutions that participate in any student financial assistance programs authorized by Title IV of the Higher Education Act

of 1965 (HEA). These programs include, but are not limited to, the Federal Pell Grant

Program, Federal Stafford Loans, and Federal Perkins Loans.

28. To obtain federal financial aid funding, HEA requires students to attend

eligible institutions.

29. In order for a school to obtain eligibility to participate in Title IV, HEA

programs, the school must enter into a Program Participation Agreement (PPA) with the

DOE. 20 U.S.C. § 1094(a); 34 C.F.R. § 668.14(a).

30. By entering into a PPA, the institution agrees that:

> It will comply with all statutory provisions of or applicable to
> Title IV of the HEA, all applicable regulatory provisions
> prescribed under that statutory authority, and all applicable
> special arrangements, agreements, and limitations entered
> into under the authority of statutes applicable to Title IV of
> the HEA, including the requirement that the institution will
> use funds it receives under any Title IV, HEA program and
> any interest or other earnings thereon, solely for the purposes
> specified in and in accordance with that program.

34 C.F.R. § 668.14(b)(1).

31. The PPA agreement includes a General Terms and Conditions section that

recites an institution's obligations as a recipient of Title IV funds. It states:

> The Institution understands and agrees that it is subject to and
> will comply with the program statutes and implementing
> regulations for institutional eligibility as set forth in 34 C.F.R.
> § Part 600 and for each Title IV, HEA Program in which it
> participates, as well as the general provisions set forth in Part
> F and Part G of Title IV of HEA, and the Student Assistance
> General Provisions Regulations set forth in 34 C.F.R. § Part
> 668.

32. The centrality of ongoing compliance with the terms of the PPA is evident in the statutory provision stating that compliance with the requirements of the PPA "shall condition the initial *and continuing* eligibility of an institution to participate in a program . . ." 20 U.S.C. § 1094(a) (emphasis added). This is confirmed in the DOE's controlling regulatory language:

> A program participation agreement conditions the initial *and continued* participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part the individual program regulations, and any additional conditions specified in the program participation agreement that the Secretary requires the institution to meet.

34 C.F.R. § 668.14(a)(1) (emphasis added).

33. Generally, an institution enters into its first PPA for a provisional period, after which, the school may be certificated to participate for up to six years. 34 C.F.R. § 668.13(b)(1).

34. An important condition of the PPA is that an institution agrees to establish and maintain administrative procedures and records to ensure proper and efficient administration of Title IV funds. 20 U.S.C. § 1094(a)(3); 34 C.F.R. § 668.14(b)(4).

35. Institutions are also restricted from requiring students to borrow additional federal funds because of delays attributable to the institution. 20 U.S.C. § 1094(a)(19); 34 C.F.R. § 668.14(b)(21).

36. Once becoming eligible under a PPA, an institution must complete an annual compliance audit of its administration of its Title IV programs, and an audit of its general purpose financial statements. 20 U.S.C. § 1094(c)(1)(A)(i); 34 C.F.R. § 668.23.

37.     Since only eligible institutions may provide Title IV financial aid to students, every request by an institution on behalf of an individual student is made with at least an implied certification that the institution is eligible to receive and distribute those funds.

### 1.     Accreditation

38.     Under a PPA, an eligible institution must "meet the requirements established by the Secretary and accrediting agencies or associations." 20 U.S.C. § 1094(a)(21); *see also* 34 C.F.R. 668.14(23).

39.     An eligible institution must be truthful about its accreditation. An eligible institution that makes a substantial misrepresentation to a student or accrediting agency is subject to various sanctions including termination of eligibility to participate in Title IV, HEA programs. 34 C.F.R. § 668.71. A substantial misrepresentation includes a false, erroneous, or misleading statement "on which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." 34 C.F.R. § 668.71(c).

40.     An institution is prohibited from misrepresenting or making misleading statements concerning its specialized accreditation to students or prospective students. 34 C.F.R. § 668.72(a).

### 2.     The 90/10 Rule

41.     Another material PPA condition a for-profit institution must satisfy in order to receive Title IV funds is known as the 90/10 Rule. 20 U.S.C. § 1094(a)(24); 34 C.F.R.

§ 668.14(b)(16). This regulation requires for-profit colleges to receive no more than 90%

of their revenue from Title IV federal student aid. The regulation states:

> In the case of a proprietary institution of higher education...
> such institution will not derive less than ten percent of such
> institution's revenues from sources other than funds provided
> under this subchapter. . . .

20 U.S.C. § 1094(a)(24).

42.     The controlling regulations further state that, regardless whether any Title

IV funds are credited to a student's account or paid directly to the student, the institution

"must presume" that those funds "will be used to pay the student's tuition, fees, or

institutional charges." 34 C.F.R. § 668.28(a)(4).

43.     If an institution fails to meet the 90/10 Rule for two consecutive fiscal

years, then it loses its eligibility to participate in Title IV funding. 20 U.S.C. §

1094(d)(2).

44.     The regulatory ban was enacted in 1992 amid reports of numerous

institutions enrolling unqualified students for the sole reason of receiving federal student

aid funds from the United States Government.

45.     As part of the 90/10 Rule, an institution has an obligation to truthfully

report the percentage of revenue from Title IV and non-Title IV sources to the Office of

the Secretary, DOE on an annual basis and must notify the Secretary no more than 45

days after the end of any fiscal year that it fails this requirement. 34 C.F.R. §§668.28(a)

and (c)(3).

### 3. Incentive Compensation Ban

46. Another condition of the PPA is compliance with what is called the incentive compensation ban (ICB). 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(i). This requirement is explicitly referenced in the PPA.

47. The ICB prohibits a school from paying staff involved with any student recruiting, admission activities or decisions regarding the award of student financial assistance, a "commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid." 20 U.S.C. § 1094(a)(20); *see also*, 34 C.F.R. § 668.14(b)(22)(i).

48. Payment of multiple adjustments in a calendar year violate the ICB if they are "based in any part, directly or indirectly, upon success in securing enrollments." 34 C.F.R. § 668.14(b)(22)(i)(B).

49. As the DOE explained in 2010, the purpose of this ban is to prevent predatory recruiting: when compensation is based "substantially, if not entirely, upon the numbers of students enrolled, the incentive to deceive or misrepresent the manner in which a particular educational program meets a student's need increases substantially." 75 Fed. Reg. 34, 806,34,817 (June 18, 2010).

## FACTUAL ALLEGATIONS

### A.    Gravely's Tenure at NAU

50.    Relator Brian Gravely began working at NAU in 2007 as an adjunct professor in the Paralegal Studies Department. Gravely has taught courses at NAU every term since 2007.

51.    Gravely taught classes both in the classroom and online. He taught classes in NAU's undergraduate and graduate programs. The courses he taught pertained to law, criminal justice, business, and philosophy.

52.    In 2009, Gravely was promoted to the Regional Legal Studies Coordinator for NAU's Minnesota region. In this position, Gravely managed the Paralegal program for all six Minnesota campuses. In that capacity he hired and supervised faculty. He further successfully achieved accreditation for his region by the American Bar Association (ABA).

53.    In 2014, Gravely was again promoted, this time to System Chair of Paralegal Studies (also known as the Associate Dean). In this position, Gravely oversaw all of NAU's paralegal and prelaw programs. He developed curriculum and expanded the Paralegal program into new geographic areas. Gravely was also responsible for ensuring that his program complied with State, Federal, and accreditation requirements.

54.    In mid-July 2015, Dr. Bob Paxton, President of External Relations and Strategic Initiatives, asked Gravely to take on a leadership role in the newly created

Continuing Education Department as the Continuing Legal Studies Director, a position that would report to Paxton.

55. Gravely never received a position description for the job or any detail concerning the duties he would be undertaking in this new position. Paxton simply instructed Gravely that his duty was to create legal courses for the new Continuing Education Department's curriculum.

56. In these various leadership roles, Gravely interacted with higher level NAU executives and participated in meetings with those executives, along with other directors and coordinators. From this vantage point he observed systemic problems and NAU's failure to address them.

57. Gravely was terminated from his position as Continuing Legal Studies Director on May 24, 2016.

## B. NAU's Fraudulent Conduct in Violation of the False Claims Act

### 1. Medical Assisting Program

58. One of NAU's highest revenue generating programs is the Medical Assisting program. The largest single program on several Minnesota campuses, NAU's Medical Assisting program averages about 700 students per year.

59. NAU's Medical Assisting program, which resulted in an associate of arts degree, is accredited through the Commission on Accreditation of Allied Health Education Programs (CAAHEP). A student who completes a CAAHEP-accredited

Medical Assisting program is eligible to take the Certified Medical Assistant exam of the

American Association of Medical Assistants (CMA(AAMA)).

60.     CAAHEP is an accrediting agency recognized by the Council for Higher

Education Accreditation.[16] Medical Assisting programs are accredited by CAAHEP

based on the recommendation of the Medical Assisting Education Review Board

(MAERB), which is a Committee on Accreditation of CAAHEP.

61.     CAAHEP and MAERB have published Standards and Guidelines for the

Accreditation of Educational Programs in Medical Assisting.[17] In those documents, the

"standards," printed in typeface, constitute "the minimum requirements to which an

accredited program is held accountable." (2008 Standards at 1.) Guidelines are printed in

italic typeface and are "descriptions, examples, or recommendations that elaborate on the

Standards." (2008 Standards at 1.) Additionally, MAERB publishes a Policies &

Procedures Manual for CAAHEP Accredited Medical Assisting Programs.

62.     Substantial misrepresentations to an accrediting agency or students about

the nature of its educational programs are prohibited by NAU's PPA. 34 C.F.R. § 668.71.

A substantial misrepresentation includes a false, erroneous, or misleading statement "on

---

[16] http://www.caahep.org/Content.aspx?ID=63

[17] There are two relevant versions of the Standards and Guidelines. The first shall be referenced as the
2008 Standards and was effective from 2008 through March 31, 2015. *See*
http://www.caahep.org/documents/file/For-Program-Directors/MA2008Standards0209.pdf. The second
became effective April 1, 2015 (2015 Standards). *See*
http://www.caahep.org/documents/file/Publications-And-Governing-
Documents/MedicalAssistingStandards.pdf. Since the accreditation site visit referenced in this Complaint
occurred in 2013, the 2008 Standards shall be referenced. To the extent that the 2015 Standards are
meaningfully different, they shall be cited in a footnote.

which the person to whom it was made could reasonably be expected to rely, or has reasonably relied, to that person's detriment." 34 C.F.R. § 668.71(c).[18]

63. On March 20, 2009, NAU received its initial accreditation from CAAHEP for its Medical Assisting program in Roseville, Minnesota with an additional approved campus in Bloomington, Minnesota. That initial accreditation status was set to expire on March 31, 2012. As discussed below, NAU had its continuing accreditation site visit in March 2013. Between accreditation reviews, NAU is obligated under the MAERB Policies & Procedures, among other things, to provide an Annual Report Form to the Board that focuses on the level of achievement of outcomes designated in the CAAHEP Standards and Guidelines. (MAERB 2016 Policies & Procedures, Policy 205.) These outcomes include national credentialing exam performance, retention, graduate and employer satisfaction, job placement, and programmatic summative measures. (2008 Standards at 4.)

64. Gravely became aware of problems with NAU's Medical Assisting program in multiple ways. He participated in required management meetings (sometimes called "State of the Program" meetings) that included program directors and NAU upper management. At those meetings, issues within the various programs were raised and discussed.

65. Relator interacted with program directors in other ways as well. From 2009 until September of 2011, Gravely shared an office at NAU's Roseville campus with the

---

[18] Making a substantial misrepresentation to an accrediting agency or students subjects an institution to various sanctions including termination of eligibility to participate in Title IV, HEA programs. 34 C.F.R. § 668.71(a).

Regional Coordinator for Medical Assisting (MA Regional Coordinator)—WL.[19] WL oversaw the Medical Assisting program at all of NAU's Minnesota campuses. In early 2013 all of the program coordinators including Gravely and another MA Program Chair (PV) were put into a single office. This provided extensive opportunities for additional observations and interactions related to Medical Assisting program problems. Gravely left that office in 2014 when he became System Chair of Paralegal Studies.

66.     From these vantage points, Gravely became aware that NAU's Medical Assisting practicums (externships) and record-keeping practices did not comply with CAAHEP's standards and that NAU personnel had made fraudulent representations to CAAHEP to achieve and maintain its accreditation.

67.     NAU's failures to meet the accreditation requirements for its Medical Assisting program caused NAU to falsely certify in its PPA that it was in compliance with CAAHEP's Medical Assisting accreditation standards, when it was not.

**a.     NAU's Failure to Offer Appropriate Practicums to Medical Assisting Students**

68.     CAAHEP's requirements for a Medical Assisting program[20] include, among other things, that an "unpaid, supervised practicum of at least 160 contact hours in an ambulatory health care setting, performing psychomotor and affective competencies,

---

[19] Former employees and witnesses are referenced by their initials in the Complaint. They are identified in the required Disclosure Statement.

[20] Since the accreditation site visit referenced in this Complaint occurred in 2013, the Standards and Guidelines effective from 2008 through March 31, 2015 (2008 Standards) will be cited. 2008 Standards: http://www.caahep.org/documents/file/For-Program-Directors/MA2008Standards0209.pdf. To the extent the Standards and Guidelines effective April 1, 2015 (2015 Standards) are meaningfully different, they shall be cited in a footnote. 2015 Standards: http://www.caahep.org/documents/file/Publications-And-Governing-Documents/MedicalAssistingStandards.pdf.

must be completed prior to graduation." (2008 Standards at 4.[21]) A person who has "knowledge of the medical assisting profession" must provide on-site supervision of the student. (2008 Standards at 4.)

69.     The importance of providing an appropriate practicum to CAAHEP accreditation is stressed in its guideline stating that NAU should

> *ensure that the practicum experience and instruction of students are meaningful and parallel in content and concept with the material presented in lecture and laboratory sessions. Sites should afford each student a variety of experiences.*

(2008 Standards at 4) (italics in original).

70.     Looking at just the psychomotor competencies expected to be taught in the curriculum and demonstrated in the practicum, it is evident that a practicum must include the varied range of activities that would occur in a physician's office or medical clinic. These psychomotor competencies include the following:

> i.      Anatomy & Physiology: e.g., obtaining vital signs; performing patient screening, capillary puncture, pulmonary function testing, electrocardiography, quality control measures, and CLIA waived hematology, chemistry, urinalysis and immunology testing; screening test results; selecting proper sites for administering parenteral medication; administering oral and parenteral (excluding IV) medications; and assisting physician with patient care.

> ii.     Applied mathematics: preparing proper medication dosages for administration; and maintaining laboratory test results and growth charts.

---

[21] The 2015 Standards require an "unpaid, supervised practicum of at least 160 contact hours in an ambulatory healthcare setting, demonstrating the knowledge, skills, and behaviors of the MAERB Core Curriculum in performing clinical and administrative duties." (2015 Standards at 4.)

iii.     Applied Microbiology/Infection Control: participating in Standard Precautions training and practicing Standard Precautions; performing handwashing, sterilization procedures, and CLIA waived microbiology testing; prepare items for autoclaving; and selecting appropriate barrier/personal protective equipment (PPE) for potentially infectious situations.

iv.     Concepts of Effective Communication: using effective communication skills; preparing a patient for procedures and/or treatments; documenting patient care and education; instructing patients and advocating on their behalf.

v.     Administrative Functions: scheduling, organizing and filing medical records; using electronic healthcare records and office hardware and software; using the internet, performing routine maintenance of office equipment with documentation and performing an office inventory.

(2008 Standards at 10-14.[22])

71.     NAU's Medical Assisting program, had a difficult time placing its hundreds of students in appropriate practicums. Instead of limiting the number of students in the program to ensure that each student received a timely and appropriate learning opportunity in an "ambulatory healthcare setting," as required by CAAHEP, NAU's central office instructed WL to begin placing students in chiropractic offices for the externships. The lack of internships was a problem statewide, and not limited to the Roseville and Bloomington Medical Assisting programs.

72.     A chiropractic office cannot provide students with opportunities to observe and demonstrate the range of psychomotor competencies, as described above, that are integral to an accredited Medical Assisting program.

---

[22] The 2015 Standards present these same psychomotor competencies but in a different format, and include some additional requirements such as differentiating between normal and abnormal test results, and instructing a patient related to special dietary needs. (2015 Standards 11-18.)

73. Gravely witnessed WL's objections to placing students in chiropractic offices for their Medical Assisting practicums as inappropriate and a violation of CAAHEP's accreditation requirements. NAU nonetheless pressured WL to find placements for students, including chiropractor's offices, regardless whether the placement was appropriate for CAAHEP accreditation. Accordingly, students were placed in chiropractor's offices for their practicums.

**b. NAU's Use of Its Lack of Practicums to Increase Student Borrowing and Its Own Profits**

74. There were two ways that NAU's delays in providing appropriate practicums increased its own profits and required students to borrow funds they otherwise would not have needed.

75. First, students are expected to enroll for their practicum during their final quarter. If they have completed all their other requirements and solely need the practicum credit they can only get federal aid in the quarter[23] when they took the practicum if they take sufficient credits to qualify for aid. This meant that students had to take unnecessary courses to ensure receipt of financial aid in the quarter in which a practicum was available to them.

76. Second, NAU pressured the MA Regional Coordinator to insist that Medical Assisting students, who had reached the point where they only needed the practicum to complete their program, to take other courses each quarter until a practicum

---

[23] NAU was on a quarter rather than semester system.

was available. In other words students were discouraged from sitting out a term or two until they could be placed in a practicum.

77. Typically, students were advised to register for courses that would count toward a higher level degree, but once they completed the MA program, they typically did not pursue that degree.

78. In these ways, NAU's delays in providing practicums required students to unnecessarily borrow additional funds in violation of the PPA and federal law.

### c. NAU's Failure to Maintain Required Records for Medical Assisting Students

79. As stated above, NAU's PPA obligates it to maintain adequate administrative records for its programs. 34 C.F.R. § 668.14(b)(4).

80. Under CAAHEP's accreditation requirements, NAU must evaluate students "on a recurrent basis and with sufficient frequency to provide both the students and program with valid and timely indications of the students' progress toward and achievement of the competencies and learning domains stated in the curriculum." (2008 Standards at 4.) Integral to those evaluations is the requirement that NAU maintain records of student evaluations "in sufficient detail to document learning progress and achievements." (2008 Standards at 4.) This included documentation of the students' completion of each of several competencies required for successful completion of the program. These records are to be maintained for "student admission, advisement, counseling, and evaluation." (2008 Standards at 5.)

81. NAU failed to adequately require instructors to keep the required documentation and failed to provide adequate support for the MA Regional Coordinator to ensure the required documentation was completed and maintained. This resulted in a chronic situation where the Medical Assisting student files were significantly incomplete.

### d. NAU's Substantial Misrepresentations about Its Medical Assisting Program to CAAHEP, Its Accrediting Body

82. The System Chair for the Pharmacy Technician Program was aware in 2011, through interactions with WL and other academic deans, that the lack of appropriate practicums and proper student documentation was a state-wide problem for the Medical Assisting program. She reported the problems to Marilyn Holmgren, Associate Provost and Dean, College of Health & Sciences at NAU. No action was taken to correct these practices. Instead, Holmgren instructed her not to discuss the issue any further, especially at system program meetings.

83. Gravely witnessed WL, the then-MA Regional Coordinator, inform NAU's executives that the scheduling of an accreditation site visit from CAAHEP should be delayed due to the unsatisfactory condition of the student files.

84. In the fall of 2011, WL postponed the CAAHEP site visit to gain more time to ensure student documentation was complete. NAU immediately terminated him.

85. The site visit was moved to March of 2013.

86. NAU replaced WL with PH as the Program Chair. That person also experienced NAU's failure to provide appropriate externships to a number of Medical Assisting students and its failure to maintain proper documentation, including

competencies and program evaluations. PH left NAU in February 2013 just prior to the March accreditation site visit and had the impression that NAU would not have passed an accreditation visit due to the lack of adequate externships and proper documentation. Her supervisor, the Academic Dean of the Roseville campus at the time, was also aware of the lack of appropriate internships, the inappropriate placement of some students in chiropractic offices, and the lack of required documentation for the students.

87.     In particular, the Academic Dean was aware of a student who left NAU for a short time and then planned to return to complete her practicum, the only requirement needed to finish the Medical Assisting program. NAU was unable to document the extent to which she had completed the requirements of the program. The student was told she would have to re-do those requirements and made the decision not to return to NAU.

88.     In February of 2013, just weeks before the site visit, NAU then hired a new MA Coordinator—PV[24]—who had no experience as a coordinator and no experience with accreditation site reviews. She, too, was supervised by the Roseville Academic Dean, who observed that she had grave concerns about NAU's ability to pass the accreditation visit.

89.     The day before the CAAHEP accreditation site review in March 2013, NAU's System Chair of Medical Assisting, Kathy Ogdie travelled from her Sioux City, South Dakota home office to the Roseville campus.

---

[24] However, NAU listed the Brooklyn Center Program Chair on its materials.

90.     In a marathon session, Ogdie instructed the brand new MA Coordinator, PV, to go through boxes containing student files and documents and worked with her to assemble a small stack of student files for the audit. They added documentation, sent emails to students and generally worked to make the files look complete. Random documents and incomplete files were set aside.

91.     Ogdie, the Roseville Academic Dean, and the new MA Coordinator participated in the March 2013 site visit. Before it began, Ogdie made it clear that she would be the spokesperson for NAU and directed the Coordinator and the Dean to direct any questions about the processes of the Medical Assisting program to her.

92.     When the CAAHEP auditors arrived, NAU rolled a cart with a stack of about 30 carefully culled files into the conference room where they were working. NAU represented to the auditors that the files on the cart were representative student files and that the other student files were located in a safe and accessible location—file cabinets in a closet that was located in another room.[25] The auditors did not press to examine any student files other than those files provided to them.

93.     Based on NAU's representations about its program, CAAHEP sent it a letter dated September 23, 2013 stating that CAAHEP had awarded continuing accreditation to the Medical Assisting program associate degree program, Roseville. That said, the letter imposed response obligations for seven citations, including, for example:

    a.  the lack of a grading scale for particular courses;

---

[25] The closet for "student files" was in the then-office for all the coordinators, including Gravely.

  b. the absence of a single competency ("Identify emergency preparedness plans in the community") from the curriculum;

  c. the lack of documentation that a particular student had the required immunizations before beginning her practicum; and

  d. the absence of an affiliation agreement for the practicum site of one student.

NAU was informed that failure to correct these deficiencies could result in the withdrawal of accreditation.

  94. The Accreditation On-Site Survey Report – Continuing Accreditation form provided to NAU after the Roseville site visit itemizes all of the components of the site visit. From this report it is evident that NAU falsely represented to CAAHEP that it was keeping proper records of student evaluations and progress and that it was providing timely and appropriate practicums to the students.

  95. For example, Section II.C. indicates "Met" for the requirement that NAU will "provide evidence that all students have achieved basic competencies prior to entry into the field." Similarly, Section IV.A.2. titled "Documentation" indicates "Met" for the requirement "records of student evaluation maintained in sufficient detail to document learning and achievements."

  96. With respect to student practicums, the form at Section III.C.2. states "Met" for the requirement that practicums occur "in an ambulatory health care setting" and that the practicum involves "performing administrative & clinical procedures."

  97. In a general section of the form titled "Resources," NAU was evaluated in Section III.A. as having "Met" the requirement of having sufficient clerical and support

staff as well as having sufficient "clinical (practicum) affiliations" "to ensure achievement of the program's goals."

98.     To achieve these results in the CAAHEP report, NAU had to misrepresent both the woefully incomplete state of its student files and its failure to provide all students with a timely and appropriate practicum. Given the nature of the citations that *were* imposed on NAU, involving granular details such as a missing form for a single student or the absence of an affiliation agreement for a particular practicum, it is evident that NAU could not have been truthful about its record-keeping and practicums. If it had, those deficiencies in critical components of the Medical Assisting program surely would have been recorded in the report, identified in the accreditation letter, and likely would have required immediate correction given the systemic nature of the student file inadequacies and the integral role that the practicums play in the program. Indeed failure to assess student performance and failure to provide an appropriate practicum in an ambulatory care setting are listed as independent bases on which an institution may be subject to probation and withdrawal of accreditation if not cured. (2016 MAERB 2016 Policies & Procedures, Policy 335.)

99.     PV left the position of MA Coordinator shortly after NAU received the accreditation letter. She was replaced by SD.

100.     Shortly after she was hired, SD was instructed by NAU System Chair of Medical Assisting, Cathie Ogdie, to falsely certify to CAAHEP that all deficiencies cited in the CAAHEP letter had been addressed. SD resisted that request.

101.    Eventually, NAU administrators handled the certification, making false representations to CAAHEP that NAU had resolved the deficiencies when, in fact, it had not. SD has since left NAU based on her concerns about such conduct.

102.    In 2013, NAU sought separate and initial certification for its Medical Assisting program associate degree program, Bloomington. Based on NAU's representations about its program, CAAHEP sent it a letter dated September 23, 2013 stating that CAAHEP had awarded continuing accreditation to that program as well.

103.    Since the Bloomington Medical Assisting program had previously been a part of the Roseville accreditation and had been managed by the same administrators, on information and belief, similar misrepresentations must have occurred to achieve initial accreditation in 2013. Similarly, on information and belief, based on the intimate involvement of NAU upper management, including Ogdie, in the accreditation process for the Medical Assisting program NAU's programmatic deficiencies were likely a systemic issue at all of its campuses.

104.    Gravely had brought concerns about the Medical Assisting program to the attention of NAU's general counsel, Paul Sedlacek, several times in 2013, including during an American Association for Paralegal Education conference the two attended. Gravely did not see any changes resulting from that report.

105.    As discussed below, NAU's fraudulent conduct with respect to the Medical Assisting program violated the FCA in multiple ways.

## 2. Misrepresentations Related to the 90/10 Rule

106. As stated above, to be eligible for Title IV funds, NAU cannot receive more than 90% of its total revenue from Title IV funds. Put another way, at least 10% of its revenue must be from sources other than student loans.

107. In fiscal years 2014[26] and 2015, NAU was dangerously close to violating the 90/10 Rule, which would make it ineligible to receive Title IV funds. In the fiscal year ending May 31, 2014, NAU reported that 89.3% of its revenue came from Title IV funds.[27] In the fiscal year May 31, 2015, NAU's Title IV revenue was 89.2%.[28]

108. NAU offered non-credit programs at least as far back as 2012, when a Certified Nurse Assistant (CNA) program was offered at the Bloomington, Minnesota campus, as part of the nursing program. In 2013, Relator led mediation training as a non-credit course, under the auspices of the local campus (in that case, Burnsville). In the summer of 2015, NAU created its Continuing Education Department to oversee non-credit courses/programs that it offered.

109. Increasing NAU's non-Title IV revenue was a motivating factor in creating the Continuing Education Department. In its August 5, 2016 annual Form 10-k, NAU stated that the continuing education courses were intended to lower its percentage of Title IV revenue: "In the future, we expect to continue our current initiatives to increase revenue from sources other than Title IV programs, such as our non-Title IV continuing

---

[26] NAU's fiscal year went from June 1 of the prior year to May 31 of the following year.
[27] http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf at 39.
[28] http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf at 39.

education programming."[29] Accordingly, continuing education programming is viewed as a source of non-title IV revenue to achieve at least the required minimum 90/10 proportion.

110. Consistent with the desire to meet the 90/10 requirement through continuing education courses, NAU, through Paxton and Cudmore, pressured Gravely to focus on getting revenue from enrollments rather than build courses for the continuing legal studies program, which is what he believed he had been promoted to do.

111. During some of the months Gravely worked as Director of Continuing Legal Education, he reported to a Vice President for Corporate and Workforce Education. That employee also experienced NAU's focus on generating immediate revenue rather than properly developing continuing education offerings.

112. The Academic Dean of the Roseville campus was aware of at least one occasion where the Roseville campus Title IV percentage was 91%. When that happened NAU management was so desperate that it directed campus directors to seek out corporate donations to increase its non-Title IV revenue.

113. In its calculation of revenue percentages for purposes of the 90/10 rule, NAU is obligated to report "Title IV aid" as part of the 90% of revenue and "student payments" as part of the 10% of revenue. 34 C.F.R. App. C to Subpart B of Part 668.

---

[29] http://filings.irdirect.net/data/1399855/000165495416001234/nauh_10k.pdf at 53.

114. However, the majority of students enrolled in NAU's Continuing Education programs are also matriculating students at NAU's general campuses and are currently receiving Title IV funds.

115. Relator has taught continuing education courses that are comprised *entirely* of matriculating students, using Title IV funds to cover the cost of their education at NAU. Gravely knew through his interactions with the students that they would not have been able to pay for the continuing education courses if they did not use Title IV monies to pay for them.

116. The chart below details various NAU continuing education courses and the percentage of students in those courses who are also part of the general student population receiving Title IV funds.

| Campus | Course Title | Academic Year | Percentage of Title IV Students |
|--------|--------------|---------------|--------------------------------|
| Burnsville | Family Law Mediation | 2014 | 100% |
| Burnsville | Civil Law Mediation | 2014 | 100% |
| Sioux Falls | Family Law Mediation | 2015 | 50% |
| Houston | Family Law Mediation | 2015 | 0% |
| Burnsville | Family Law Mediation | 2016 | 100% |
| Alexandria | Family Law Mediation | 2016 | 0% |

117. Upon information and belief, the chart above is a representative sample of the proportion of Title IV students in Continuing Education courses across NAU.

118. To the extent that these students are using Title IV funds for non-credit continuing education programming those payments should not be included in the 10% of revenue characterized as non-Title IV revenue.

119.    Upon information and belief, NAU reports revenue from continuing education programs as non-Title IV revenue, irrespective of whether or not students paid for the program using Title IV monies.

120.    During the time that Gravely worked as the Continuing Legal Studies Director, Paxton and Cudmore repeatedly emphasized the importance of increasing enrollments in the continuing education courses. They evaluated his performance not on the development of new courses and programs, but on the number of students enrolled in the immediate courses that were offered. The urgency of immediately increasing continuing education enrollments was evident to Gravely.

121.    As discussed in more detail below, NAU's false reporting of its statistics pursuant to the 90/10 Rule constituted a violation of the FCA.

### 3.    Violation of the Ban on Incentive Based Payments

122.    As stated above, Dr. Bob Paxton, President of External Relations and Strategic Initiatives, and Marcie Cudmore, the Associate Vice President of Academic and International Relations, interviewed Gravely for the position of Continuing Legal Studies Director in the summer of 2015. During the interview, Paxton and Cudmore told Gravely that, besides a salary increase in the new position, he would receive financial incentives (between $25,000 and $50,000, or more) if he reached certain revenue benchmarks.

123.    The only way to generate revenue in the Continuing Education Department is by recruiting students to enroll in continuing education classes.

124. NAU's Continuing Education Department was responsible for recruiting students to enroll in its own courses and was not supported by personnel in NAU's Admissions Department. For example, on October 4, 2015, NAU's Campus Executive for the Denver and Centennial campuses told Gravely the Denver Director of Admissions refused to allow admissions staff to help him with student enrollment because they did not get credit for recruiting students in continuing education programs.

125. Accordingly, the revenue benchmarks NAU expected Gravely to meet to receive the bonuses promised at his interview were tied directly to recruiting student enrollees.

126. Early in Gravely's tenure in the new position, Paxton praised him for his initial efforts in developing programs for the Continuing Education Department and encouraged him to "go slow" and build the department for the long term. Gravely agreed with this philosophy, but it was short-lived during his tenure as Director of Continuing Legal Education. Very soon the focus changed to generating immediate revenue.

127. At a July meeting with Gravely, Paxton informed Gravely that he would receive a salary raise of $25,000 (from $75,000 to $100,000) for the year if he hit the $300,000 revenue benchmark and $45,000 (to $120,000) if he hit a benchmark of $500,000 or more.

128. In an August telephone call, Paxton told Gravely words to the effect of, "I am looking forward to paying you $100,000 soon. I am sure you will get the revenue we need soon."

34

129. On September 25, 2015, Gravely attended a group lunch with Paxton, Cudmore, System Director of Human Resources John Woolsey, and RM, the Nursing Assistant Program Director in the Continuing Education Department for NAU's Bloomington, Minnesota campus.

130. During this meeting, Gravely learned that RM had received additional payment from NAU directly tied to her success in enrolling students in continuing education programs. Specifically, Paxton told Wolsey that RM and Gravely were on a different compensation structure that included incentive payments based on increased revenue from enrollment.

131. Also during this meeting, Paxton stated that RM had done a great job on producing revenue and as a result had received additional payment above her basic salary. Paxton did not state the specific amount given to RM.

132. Other than increasing enrollment numbers, there was no substantive change in RM's position or job duties. At that time she had not received a promotion, increase in responsibilities, or increase in geographic scope. Before and after Paxton stated that RM had received an additional payment she remained solely in charge of the continuing education CNA program at the Bloomington, Minnesota Campus.

133. In the next months, Gravely was moved from project to project based on Paxton's view of what continuing education courses would provide "low hanging fruit" —immediate enrollment revenue. Gravely began developing courses around real estate

law and mediation training. Then he was told to stop and move in another direction – human resources. Later, he was told to go back and develop mediation programs.

134.    In November 2015, Gravely was on a call in which Paxton stated that the revenue being generated by the Continuing Education Department was inadequate. Paxton indicated that if there was not improvement in the Department, it was possible that positions may have to be eliminated.

135.    During a team meeting in December 2015, Paxton directed the group to increase revenue and enrollments. Paxton told the group that he would provide salary increases if they produced enrollments and revenue.

136.    On February 4, 2016, Gravely participated in another phone conversation with Paxton and Cudmore. They told Gravely that the Continuing Education Department was falling short of their expectations for revenue generation and he needed to enroll at least 20 students by the end of the month in order to avoid termination.

137.    This telephone conversation made it clear to Gravely that his performance was being directly tied to the number of students he enrolled in his programs, as opposed to the development of a robust curriculum that could be successful in the long term as he had been initially instructed.

138.    As discussed in more detail below, NAU's use of incentive compensation to increase student enrollment constituted a violation of the FCA.

### 4. NAU's Conduct Violated the FCA in Multiple Ways and Damaged the Government in Multiple Ways

139.    In its PPA, entered into in June of 2013, in its annual compliance reports to the DOE, and in its regular submission of requests to receive Title IV monies on behalf of students, NAU represented that it was in compliance and would continue to remain in compliance with the provisions of the PPA, which included compliance with Title IV and its supporting regulations.

140.    Compliance with its PPA is a material term of NAU's eligibility to receive Title IV monies.

141.    However, NAU failed to comply with its PPA in multiple ways, thereby violating the False Claims Act by making false statements and causing false statements to be made to induce or cause the Government to pay Title IV monies it otherwise would not pay.

142.    NAU's fraudulent conduct with respect to its Medical Assisting program included the following:

      A.    NAU fraudulently represented to the Government in its PPA that it had met the CAAHEP accreditation requirements for its Medical Assisting program, when it had not;

      B.    NAU violated the PPA prohibition against making substantial misrepresentations to accrediting agencies by representing in its accreditation site visit in February 2013, and in its subsequent Annual Report forms to the MAERB, that its Roseville, Minnesota program was, and would continue to be, in compliance with Medical Assisting program accreditation requirements; more specifically, NAU fraudulently represented:

1. that it was providing appropriate practicums for its students as required by CAAHEP, when it was not;

2. that it was maintaining appropriate documentation related to students and their performance in the program, when it was not;

3. that it had adequate clerical and support resources when its failure to adequately maintain student records showed it did not; and

4. that it had adequate practicum affiliates, when it did not, because students were forced to participate in inappropriate practicums and were forced to delay completing their programs because they could not access an appropriate practicum.

C.  NAU violated the PPA prohibition against requiring students to borrow additional federal funds because of delays attributable to the institution when it failed to provide timely and appropriate practicums for its students, due to the lack of sufficient, appropriate affiliates to provide timely practicums for all the students NAU enrolled in the Medical Assisting program.

143.  With respect to the 90/10 Rule, NAU, on information and belief, fraudulently represented to the Government that it was in compliance with the Rule, and therefore with its PPA, when it was fraudulently including Title IV monies used for continuing education courses in its calculation of "student payments" rather than "Title IV aid," thereby falsely skewing the calculation of the 90/10 proportions.

144.  The Government was damaged by this conduct to the full extent of the Title IV monies it extended to NAU as an eligible institution and in compliance with its PPA, when, in fact, it was neither. The government is also entitled to civil penalties for every request for Title IV monies NAU made on behalf of individual students. This is because

each request was a false certification that NAU was an eligible and PPA-compliant institution, when it was not.

## C.   NAU's Retaliatory Termination of Gravely

### 1.   Gravely's Track Record of Success at NAU

145.   As described above, Gravely performed his various jobs well and was promoted several times. In the last evaluation he received on October 27, 2014, when he was System Chair of Paralegal Studies, Gravely received a rating of "outstanding" in all areas. Comments from the 2014 evaluation include:

- "works past scheduled hours to complete projects,"

- "Brian maintains good relationships with both the campuses and Central Administration. Brian has also fostered good relationships with students and the ABA,"

- "Brian is an innovative thinker who is constantly pushing the Paralegal program forward and has found ways to improve on a strong program and have it grow with the institution,"

- "The [paralegal] program will play an integral role in the Academic realignment and will show leadership for other departments in the future."

146.   Early in Gravely's tenure in his position as Director of Continuing Legal Education, his new boss, Paxton, praised Gravely for his initial efforts in developing programs for the Continuing Education Department. In a July 22, 2015 email to Gravely, Paxton wrote: "I have been very pleased with your progress in all areas you are working with Legal Studies and related programs…Your plan is ambitious, yet realistic. You are on target, keep forging ahead…"

147. Dr. Paxton also encouraged Gravely to "go slow" and build the Continuing Education Department for the long term. Mr. Gravely agreed with this philosophy.

148. On August 1, 2015, Gravely fully moved into his new role as Continuing Legal Studies Director. He never received any job description or formal listing of his duties for this position. He was simply instructed that he was to create legal courses for the new Continuing Education Department's curriculum.

149. As described above, in the next months Gravely was moved from project to project based on Paxton's constant changes of mind regarding what courses would generate the most income for the continuing education program. Despite this, it did not take long before Gravely successfully developed mediation programs for the Alexandria Community College and NAU's Burnsville campus. The Minnesota Supreme Court approved Gravely's courses in February 2016, which was a significant accomplishment.

150. Gravely's accomplishments did not end there. During Gravely's short time as the Continuing Legal Studies Director, Gravely also successfully:

- provided mediation training in Minnesota, South Dakota, and Texas;

- launched a continuing legal education class in Colorado;

- developed and got approval to offer an online real estate course in Colorado; and

- created three HR training courses that were demonstrated in Texas and some State colleges.

## 2. Gravely's First Report of Illegal and Fraudulent Conduct

151. Gravely's work in the Continuing Education Department, particularly his observations, described above, that NAU was using incentive pay to generate immediate enrollments and that receipt of Title IV funds for continuing education courses were being counted as part of the 10% of payments required by the 90/10 rule, caused him to formally report to NAU executives that the institution was engaging in illegal and fraudulent conduct.

152. His report was in the form of a February 25, 2016 memo sent to NAU General Counsel Paul Sedlacek by Gravely's then-attorney Jerome Klein, along with a cover letter inviting dialogue about resolving Gravely's situation and moving him to a different position.

153. In his report, Gravely discussed his employment situation, which was deeply entwined with violations of the HEA. Specifically, Gravely reported (1) NAU's Continuing Education Department was illegally offering and making incentive payments to its staff based on how many students they enrolled; and (2) NAU was fraudulently violating the 90/10 Rule.

154. After Gravely submitted his initial report, NAU placed him on "whistleblower status," said it would investigate his claims, and engaged an attorney from a large Minneapolis defense firm to investigate the claims.

155. On March 23, 2016, Gravely met with the investigating attorney and told her about what he had observed. The investigating attorney did not challenge the facts or

law communicated to her, but instead challenged Gravely about his motivation for joining the Continuing Legal Education Department.

156. On March 28, 2016, Gravely realized that his section for courses had been removed from the NAU's Continuing Education website, which meant that students could not enroll in his classes. He filed a retaliation complaint about this. NAU responded that the webpage was taken down because Gravely did not have any classes listed at the time. Throughout his tenure at NAU, Gravely never witnessed another faculty member's section taken down due to his or her classes not being listed.

### 3. Gravely's Second Report of Illegal Conduct

157. After several weeks had passed and Gravely had not heard anything related to NAU's investigation of his first report, he thought it pertinent to report his additional concerns related to other serious fraudulent conduct he observed at NAU that involved the Medical Assisting program. Gravely had expressed concerns about this conduct to Sedlacek around the time of the site visit, but believed that little had changed.

158. In an April 22, 2016 letter to Sedlacek, Gravely reiterated his original report for violations of the HEA and 34 C.F.R. § 668.14 and added his concerns about NAU's violations of and fraudulent statements about accreditation requirements for the Medical Assisting program.

159. Gravely reported the following conduct:

- NAU was not placing students in appropriate externships, instead placing many of them in chiropractic offices, which a was a violation of program accreditation requirements;

42

- NAU falsely told CAAHEP accreditors that its students were being placed in appropriate internships;

- NAU was not maintaining proper documentation related to Medical Assisting program students;

- NAU misled CAAHEP accreditors during a site visit, indicating that it was maintaining proper documentation;

- NAU falsely certified it had corrected deficiencies identified during a site visit, when it had not;

- NAU misled students to believe that NAU is properly accredited and they would receive compliant externships.

160. Gravely further reported that these violations made NAU ineligible to receive Title IV funds, and ineligible for accreditation.

161. Gravely also reported that, by representing to Medical Assisting students that they would receive the appropriate externship required by the accrediting agency, NAU had violated Minnesota's Unlawful Trade Practices Act (Minn. Stat. § 325D.09) and Minnesota's Consumer Protection Act (Minn. Stat. § 325F.69.)

162. The investigating attorney interviewed Gravely about his second report, but discounted the issues regarding the Medical Assisting program as happening long ago and based on second-hand knowledge, even though Gravely was present at some of the events discussed and had reported admissions from program coordinators.

163. Gravely suggested that the investigating attorney talk directly with persons Gravely named as witnesses to the conduct, particularly those that left NAU. Gravely is not aware that any of these corroborating witnesses were ever contacted by NAU.

43

164. In early May 2016, the Academic Dean of the Graduate School told Gravely that Paxton was watching Gravely very closely.

### 4. NAU's Sham Investigation

165. On May 23, 2016, NAU's System Director of Human Resources, John Woolsey, provided Gravely the results of the alleged investigation.

166. In short, NAU's position was that none of Gravely's concerns had any merit. Instead, NAU accused Gravely of being more concerned about "your general dissatisfaction with conditions of your employment and with your manager, than allegations of unlawful conduct." The contents of Gravely's reports belie this accusation.

167. NAU's "investigation" appears to have consisted only of conversations with Paxton, Cudmore, and Gravely. It did not appear to include any contacts with witnesses Gravely identified who could confirm the reported conduct.

168. With regards to Gravely's report of violations of the ICB, NAU denied making any incentive payments to any of its employees within its non-credit division and claimed that Gravely was merely mistaken about what he was told about payments based on enrollment during his initial job interview and in subsequent communications.

169. NAU further denied any regulatory violations by its Medical Assisting program.

170. Finally, NAU's investigation results did not mention, let alone address or deny, the concerns Gravely raised related to the 90/10 Rule violations.

**5.    Gravely's Termination in the Guise of a Claimed Reduction in Force**

171.    On May 24, 2016, one day after the completion of NAU's investigation, Gravely was terminated as part of an alleged reduction in force.

172.    NAU's stated reason for the reduction in force and termination of Gravely was "a lack of growth in enrollment and revenue."

173.    NAU's stated reason for Gravely's termination do not ring true for many reasons.

174.    NAU's August 5, 2016 Form 10-K states that Continuing Education enrollment almost doubled during the time that Gravely was involved in the department. It increased from 519 students in May 2015 to 972 students in May 2016.

175.    That same Form 10-K also stated that NAU was counting on expansion of its Continuing Education program to increase non-Title IV revenue, thereby ensuring compliance with the 90/10 Rule.[30]

176.    In addition, Gravely had only been in his new position for about ten months when he was terminated. During that short time in his new position, Gravely had already developed several programs and had additional programs planned for the spring semester.

177.    Furthermore, during the short time Gravely had functioned in his new position, he had been given inconsistent instructions on what courses to focus his attention. This back and forth between course developments substantially hindered Gravely's ability to properly develop Continuing Education programs to offer.

---

[30]https://www.sec.gov/Archives/edgar/data/1399855/000165495416001234/nauh_10k.htm

178. Gravely was the only employee eliminated from the Continuing Legal Studies Program. He was terminated from a director-level position while eight other directors in the potential RIF group were retained.

179. Upon information and belief, none of the other eight directors made any reports of wrongdoing at NAU.

180. Despite Gravely's past success in the legal programs on the academic side of NAU, Gravely was not offered the opportunity to move back into his previous role as System Chair of Paralegal studies or some other position at NAU commensurate to his experience and expertise. Gravely continues to teach classes at NAU.

## COUNT I
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT

Relator realleges each and every paragraph of this Complaint.

181. By the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

182. By virtue of the acts alleged above, Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(B).

183. The United States, unaware of the falsity or fraudulent nature of the claims presented or caused to be presented by Defendants, paid for claims that it otherwise would not have paid because of Defendants' fraudulent representations of regulatory and contract compliance and program accreditation status.

184.    Because of the Defendants' acts, and by reason of these payments and benefits given, the United States sustained damages and continues to be damaged in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus the maximum penalty available for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT II
## RETALIATION IN VIOLATION OF
## THE FALSE CLAIMS ACT AT 31 U.S.C. § 3730(h)

Relator realleges each and every paragraph of this Complaint.

185.    Plaintiff was unlawfully threatened, harassed, disciplined, and discharged by Defendants in retaliation for lawful acts done by him on behalf of the United States and the general public in furtherance of an action under this section, as well as his efforts to stop one or more violations of the False Claims Act. Defendants violated 31 U.S.C. § 3730(h)(1) when it retaliated against Relator for exercising his rights and engaging in protected action under the False Claims Act.

186.    As a direct result of Defendants' unlawful retaliatory conduct, Relator has experienced damages for which he is entitled to relief under 31 U.S.C. § 3730(h)(2).

## COUNT III
## VIOLATIONS OF THE MINNESOTA WHISTLEBLOWER ACT

Relator realleges each and every paragraph of this Complaint.

187.    The Minnesota Whistleblower Act, Minn. Stat. § 181.932 et seq. prohibits retaliation against employees for making good-faith reports of violations of law.

Minn. Stat. § 181.932, subd. 1 (2014).

188. Relator reported what he reasonably and in good faith believed to be legal violations.

The laws that Relator believed, in good faith, Defendants violated include, but are not limited to;

- Violations of the False Claims Act 34 C.F.R. § 3729 *et seq.*;

- Violations of 34 C.F.R. 668 *et seq.*;

- Breach of contract (PPA contract with the DOE; accreditation contract with CAAHEP);

- Violations of the Minnesota Consumer Fraud Act (Minn. Stat. § 325F.69); and

- Violations of the Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.44).

189. Defendants retaliated against Relator as a result of his reported objections by terminating his employment.

190. The adverse employment actions as alleged herein constitute violations of the Minnesota Whistleblower Act, Minn. Stat. §§ 181.931 *et seq.*

191. The unlawful employment practices complained of above were intentional and were performed by Defendants with malice and/or with reckless indifference to the Minnesota Whistleblower Act, which protects Relator.

192. As a direct and proximate result of Defendants' illegal conduct, Relator has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain

48

and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and has incurred attorneys' fees and expenses and other serious damages.

**COUNT IV**
**WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**

Relator realleges each and every paragraph of this Complaint.

193.    Relator was wrongfully discharged by Defendants, in violation of public policy, for, in good faith, reporting and objecting to illegal conduct at Defendants that also resulted in violations of the federal False Claims Act.

194.    Relator's discharge was for reasons that contravene multiple clearly mandated public policies. These include but are not limited to public policies underlying the (1) federal False Claims Act, which protects the public fisc from illegal corporate conduct; and (2) anti-retaliation provision of the federal False Claims Act, which provides protection to individuals who report violations of the False Claims Act, for the purpose of enforcing those important statutes.

195.    Relator acted in good faith, in reporting and objecting to illegal conduct, because he reasonably believed the conduct violated the federal False Claims Act.

196.    The unlawful practices complained of above and Relator's termination were intentional and performed by Defendants with malice or reckless indifference to the rights or safety of Relator and others.

197.    As a direct and proximate result of Defendants' illegal conduct, Relator has suffered, and continues to suffer, emotional distress, humiliation, embarrassment, pain

and suffering, loss of reputation, loss of enjoyment of life, lost wages and benefits, and

has incurred attorneys' fees and expenses and other serious damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator Brian Gravely and the United States of America request

that this Court:

A.     Enter judgment for the United States Government and the Relator and

against Defendants;

B.     Order Defendants to cease and desist from violating the False Claims Act,

31 U.S.C. § 3729 *et seq.*;

C.     Award the United States Government three times the amount of the actual

damages sustained by the government as a result of Defendants' violations of the False

Claims Act as alleged in this Complaint;

D.     Assess civil penalties in the maximum amount available against the

Defendants for each and every false claim submitted by the Defendants to the United

States government in connection with the false statements and false claims alleged in this

Complaint;

E.     Award the Relator the maximum "relator's share" allowed pursuant to 31

U.S.C. § 3730(d);

F.     Award prejudgment interest;

G.    Award the Relator statutory attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);

H.    Award the Relator, with respect to his federal and state retaliation claims:

        1.    Two times the amount of any back pay that he would have had but for the retaliation, and interest on the back pay;

        2.    Compensation for all special damages, including emotional distress, sustained as a result of the retaliation, in an amount to be determined at trial;

        3.    Punitive damages;

        4.    Litigation costs and reasonable attorneys' fees.

I.    Grant such other relief as the Court may deem just, necessary, and proper.

**RELATOR DEMANDS TRIAL BY JURY ON ALL COUNTS WHERE JURY IS AVAILABLE.**

Dated: April 2L, 2017

GOODSELL QUINN LLP

Terence R. Quinn, SD Atty No. 1411
terry@goodsellquinn.com
246 Founders Park Drive, Suite 201
Rapid City, SD 57701
Telephone: (605) 343-3000
Facsimile: (605) 343-3251

*ATTORNEY FOR RELATOR*